# EXHIBIT A

2021CV03928-14
CLAYTON COUNTY, GA
6/15/2022 3:57 PM
Jacquline D. Wills
CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF CLAYTON COUNTY
### STATE OF GEORGIA

NATHANIEL CLARK,         )
                               )
        PLAINTIFF,      )
                               )
V.                             )
                             )   Civil Action No.:
CITY OF FOREST PARK, GA;  )   2021CV03928-14
LATRESA AKINS-WELLS, in her )
individual capacity       )
                             )
        DEFENDANTS.  )

### SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Nathaniel Clark ("Plaintiff" or "Chief Clark") by and through his undersigned counsel, files this SECOND AMENDED COMPLAINT against Defendants City of Forest Park, GA ("the City") and Latresa Akins-Wells ("Councilwoman Wells") (collectively "Defendants"), showing the Court as follows:

### PARTIES

1.     Plaintiff Nathaniel Clark was hired by the City of Forest Park as Police Chief on May 14, 2019 and remains employed by the City.

2.     Defendant City of Forest Park, GA has its principal address at 745 Forest Parkway, Forest Park, GA 30297.

3.     Defendant Latresa Akins-Wells is a member of the Forest Park City Council.  She is sued in her individual capacity.

### JURISDICTION AND VENUE

4.     Jurisdiction and venue are proper in the Superior Court of Clayton County.

1

5.      The City of Forest Park, GA and Councilwoman Wells are all residents of Clayton County.  All the acts complained herein occurred in Clayton County.

6.      This action has been brought within the time provided by O.C.G.A. § 45-1-4(e)(1).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      Plaintiff has satisfied all administrative prerequisites to perfect his claim of retaliation under Title VII.  Specifically, he timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

8.      Plaintiff has now received the Notice of Right to Sue for his claims under Title VII within the last ninety (90) days.  *See **Exhibit A**, Notice of Right to Sue.*

## WAIVER OF SOVERIGN IMMUNITY

9.      The right of action provided for in the Georgia Whistleblower Act, O.C.G.A. § 45-1-4, is a waiver of the City's sovereign immunity.  *See Pattee v. Ga. Ports Auth.,* 477 F.Supp.2d 1253, 1269 (S.D. Ga. 2006).

10.      The right of action provided for in Title VII of the Civil Rights Act of 1964, 42 U.S.C.  § 2000e *et seq.* is also a waiver of the City's sovereign immunity.

11.      The slanderous statements made by Councilwoman Wells were made outside her official function, and therefore official immunity does not bar Plaintiff's slander claim.  *See Gilbert v. Richardson*, 264 Ga. 744, 452 S.E.2d 476, 483 (1994) (an official function is "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts.").  *See also* O.C.G.A. § 51-1-20.

12.      As for any acts Councilwoman Wells performed in her official function, an officer may be personally liable in the performance of a ministerial duty if she acts with negligence, actual

malice or an intent to injure.  An officer may be liable for the performance of a discretionary function if she acts with actual malice or an intent to injure. Ga. Const. art. 1, § 2, ¶ IX(d); *see* O.C.G.A. § 36–33–4.

## **FACTUAL ALLEGATIONS**

13. Chief Clark was hired by the City of Forest Park as Police Chief on May 14, 2019. Chief Clark was the first and only permanent Black individual to be hired as Police Chief by the City.

14. Chief Clark has been in law enforcement for approximately 33 years and was previously a police chief for a city in Arkansas.

15. The former permanent Chief of Police for the City of Forest Park, L. Dwayne Hobbs, served as Police Chief for over two decades.

16. As Chief of Police, Chief Clark is responsible for overseeing the City's police department which includes approximately 95 sworn personnel and is responsible for the safety and protection of the 20,000 civilians residing in the City.

17. As Chief of Police, Chief Clark reports to the City Manager who in turn reports to the Governing Body.  The Governing Body is comprised of the Mayor and the five members of the City Council.

18. Soon after becoming Chief of Police, Chief Clark immediately requested that an audit be conducted on the Police Department to, among other things, determine the financial status of the Police Department.

19. The audit revealed that there were fraudulent, and unlawful, practices in the Police Department that had occurred under prior leadership.  Specifically, the audit revealed, among other

things, that the police department was selling ammunition that belonged to the City to civilians, that the police department was cashing checks made out to the City of Forest Park/Forest Park Police Department for cash and then were not turning it over to the finance department for proper documentation, and that some members of the department were doing surveillance on two city council members.

20.     Two supplemental audits were conducted which collaborated the initial audit.  As a result of the audit, some individuals in the police department were terminated and some left voluntarly.  The cases were reviewed by the Georgia Bureau of Investigations ("GBI") and were subsequently forwarded to the Clayton County prosecutor's office for possible criminal charges.

21.     In addition to the financial deficiencies uncovered in the audit requested by Chief Clark, Chief Clark uncovered other illegal practices within the police department including an illegal quota system for citations and systemic race and religious discrimination practices including recruitment disparities and "Give a Christian a Ticket Sunday" which was a practice whereby police officers would target Black and Hispanic Churches and give citations to members of those communities.

22.     In fact, the City's Hispanic population has dropped by ten (10) percentage points since 2010, from 37% to 27%, in part due to the police department previously targeting the Hispanic community and issuing them an unprecedented number of citations.  *See* ***https://canopyatlanta.org/forest-park/hispanic-communities-police/***

23.     Despite Chief Clark's uncovering of the illegal quota system for citations, some members of the Governing Body wanted the police department to continue issuing citations for

profit.  Chief Clark made it clear to the Governing Body that citations would be issued for the protection of society and not to generate revenue.

24.     In January 2020, City Manager Angela Redding left her employment with the City. Chief Clark was assigned as Interim City Manager and Police Chief from on or about January 6, 2020 until on or about May 18, 2020.

25.     As Interim City Manager, Chief Clark had access to the City's financial records and accounts, not just those of the police department.

26.     Soon after becoming Interim City Manager, Chief Clark identified financial deficiencies throughout the City, on a much larger scale.  Specifically, Chief Clark identified unlawful commingling of E-911 funds (balancing the budget by using E-911 funds) and charging SPLOST expenditures to accounts that did not exist.

27.     After identifying these financial deficiencies, Chief Clark immediately requested that an audit be conducted on the City's financial accounts given that it appeared there was unlawful activity occurring within the City.  However, upon information and belief, the City never conducted an audit on the E-911 or SPLOST accounts.

28.     In May 2020, Albert Barker was appointed to the position of City Manager.

29.     On June 30, 2020, Chief Clark received his annual performance review.  The review was very complimentary of Chief Clark's performance.  In that review, Barker wrote that "Chief Clark identified and addressed an array of structural and systemic issues (*i.e. FLSA and Title VII Violations, Enhanced Recruitment and Disparities, CAD/Record Management System failures)*." Moreover, his review stated that "during his appointment [as Police Chief] the reported crime rate was decreased significantly in 2019 (*8 year low*)."

30.     On or about July 1, 2020, Chief Clark was promoted to the position of Deputy City Manager/Public Safety Director while also maintaining his position as Police Chief.  *See **Exhibit B**, Correspondence from Barker regarding Chief Clark's promotion.*

31.     The position of Deputy City Manager/Public Safety Director was a position that had been created by the Governing Body and Barker was given discretion to appoint someone to that position.

32.     As a Deputy City Manager/Public Safety Director, Chief Clark had full management responsibility for all public safety services and activities including the police department and fire department and also had supervisory responsibility over all departments in coordination with and subject to the direction of the City Manager.  The job description specifically stated that the position would oversee "the hiring, supervision, training, evaluation and discipline of [the fire and police] department employees."  *See **Exhibit C**, Public Safety Director/Deputy City Manager job description.*

33.     When Barker appointed Chief Clark to that position, his decision was met with extreme resistance from some of the Governing Body as they were worried that, as Deputy City Manager, Chief Clark would continue to uncover fraudulent and unlawful activity as that position had access to the City's financial documents.

34.     In fact, Barker told Chief Clark that the Governing Body in part was going to do all they could to ensure that the audit he had been requesting would never be conducted and also told Chief Clark that they would continue to harass and retaliate against him to the point of having his employment terminated.

6

35.     On September 4, 2020, Chief Clark sent Barker an email that stated the following: "Recently Finance Director Ken Thompson brought to our attention that in past years SPLOST expenditures were charged to account(s) that doesn't exist.  Based on the financial inconsistencies recently brought to our attention, I am recommending that an external audit be conducted immediately regarding any and all finances."  *See **Exhibit D**, 09.04.2020 Email from Chief Clark to Barker.*

36.     Chief Clark also identified procedural concerns with the City's federal asset forfeiture account and requested that an audit be conducted.

37.     Upon information and belief, the financial audit that Chief Clark recommended regarding the federal asset forfeiture account was never conducted.  *See **Exhibit E**, 08.27.2021 Email from Chief Clark to Deputy Finance Director Darquita Williams.*

38.     Because Chief Clark was extremely concerned regarding potential fraudulent and unlawful activity occurring, Chief Clark contacted the United States Department of Justice ("DOJ") regarding the City's federal asset forfeiture account.  The DOJ stated that an audit needed to be conducted immediately.

39.     Chief Clark also discovered, or was instrumental in bringing to light, other financial discrepancies including discrepancies with the bank reconciliations (approximately $200,000 worth of discrepancies), discrepancies with the FBI reimbursement, and discrepancies with the Georgia Emergency Management and Homeland Security Agency ("GEMA") grant.

40.     On October 28, 2020, Clark again sent Barker another email requesting that a financial audit be conducted immediately based upon the DOJ's recommendation, Finance

Director Ken Thompson's admissions, and financial discrepancies previously identified. *See Exhibit F, 10.28.2020 Email from Chief Clark to Barker.*

41.    Barker told Chief Clark that he was getting directives from members of the Governing Body to stand down immediately on the financial audit.

42.    In fact, Barker told Chief Clark and others that he had been offered a large sum of money to stop the financial audits.

43.    On November 2, 2020, Chief Clark received another stellar performance review from Barker.  In that review, Barker wrote the following: "Chief Clark was appointed Deputy City Manager/Director of Public Safety on July 1, 2020; he also continues to hold the position of Police Chief; during this appointment the reported crime rate decreased significantly in 2020 (21-*year low*), this speaks volume [sic] of Chief Clark's dedication in making the community safe for all."

44.    Barker also wrote, "Deputy City Manager/Public Safety Director Clark was warned that he will face backlash referencing the audits (*funding discrepancies)* and his continual exposure of biased practices."

45.    On November 4, 2020, Chief Clark overheard a City Official make a statement that he (Chief Clark) takes detailed notes, to retrieve everything that he has been working on as Deputy City Manager and to "stop him."

46.    That same day, on November 4, 2020, Chief Clark was demoted from his position of Deputy City Manager.  Specifically, Chief Clark's contract was amended so that he would only serve as Public Safety Director and Chief of Police.  Chief Clark was only to serve as Deputy City Manager in the absence of a City Manager.

47.     However, even these duties have been stripped as Chief Clark does not serve as Deputy City Manager in the City Manager's absence.

48.     Chief Clark was demoted due to his uncovering of unlawful and fraudulent activity, specifically including his uncovering of financial discrepancies, pay disparities, systemic racism, illegal quotas, and other unlawful and fraudulent activity.

49.     Chief Clark also experienced a hostile work environment in retaliation for his uncovering of these unlawful and fraudulent activities.  Specifically, Chief Clark was asked to do things that other department heads were not required to do and his work was scrutinized and nitpicked.

50.     Soon after Chief Clark's report to the DOJ as well as his insistence on a financial audit in part due to Finance Director's Ken Thompson's admissions that SPLOST expenditures were charged to accounts that did not exist, Thompson resigned his employment with the City and took with him what appeared to be an extensive amount of confidential and highly sensitive financial documents belonging to the City.

51.     Moreover, on or about November 23, 2020, financial documents were removed from the police department without Chief Clark's consent.

52.     In March 2021, Shalonda Brown, Director of Human Resources, filed a formal complaint alleging sexual harassment by Fire Chief Don Horton.  As Public Safety Director, Chief Clark oversaw the Fire Department and Chief Horton reported to him.

53.     Chief Clark subsequently put Chief Horton on administrative leave and recommended that an external investigation be conducted.

54.     The investigation—which was ultimately submitted to the City Manager and Governing Body—confirmed that Chief Horton had been sexually harassing Brown and Chief Horton was ultimately terminated.

55.     However, during the investigation and appeal process, Chief Clark was subjected to continued harassment and verbal attacks by the Governing Body in part and Councilwoman Wells.  Specifically, during public City Council meetings, Councilwoman Wells made comments regarding Chief Clark's integrity.

56.     In fact, during the appeal hearing, Chief Clark was berated for nearly two hours by Chief Horton.  Chief Clark was mandated to appear but was not afforded an opportunity by the Governing Body to speak or defend himself in front of the community.

57.     Councilwoman Wells told Chief Clark prior to the sexual harassment allegations against Chief Horton that Chief Horton had given her $1,000 and that she had not recorded it to either her ward or to her campaign.

58.     Chief Clark told Councilwoman Wells twice that the $1,000 Chief Horton had given her needed to be recorded, however, upon information and belief, it was never recorded.

59.      Chief Clark has experienced a hostile work environment in retaliation for his protected activity, namely, his involvement in the investigation into Brown's sexual harassment allegations against Chief Horton.

60.     Specifically, Chief Clark has been verbally attacked and harassed by Wells.

61.     On or about May 28, 2021, Chief Clark was summoned to City Manager Marc-Antonie Cooper's office and accused of having the Deputy Fire Chief, Latasha Clemmons followed.  Ms. Clemmons was hired by Chief Horton.

62.     Chief Clark was placed under investigation, but the investigation showed that the allegations were unfounded.

63.     Upon information and belief, this was a conspiracy to have Chief Clark terminated.

64.     Moreover, Chief Clark has been stripped of additional job responsibilities.

65.     For example, in May 2021, the Fire Chief's reporting structure was changed so that the Fire Chief no longer reports to Chief Clark but instead reports directly to the City Manager, which is inconsistent with his job description and contract signed by the Governing Body.

66.     Additionally, when the City was recruiting for the position of Fire Chief after Chief Horton was terminated, despite Chief's Clark job description stating that he would be responsible for hiring of the fire department employees, Chief Clark was excluded from screening applicants or participating on the hiring committee.

67.     In fact, Chief Clark has been stripped of all authority regarding the fire department.

68.     Moreover, at one point Chief Clark was directed to cease all appointments/promotions at the police department until further notice.

69.     Chief Clark also has been excluded from meetings regarding police operations.

70.     Councilwoman Wells also continues to attack Chief Clark's integrity by undermining and questioning Chief Clark's actions with respect to the police department.

71.     For example, every time a police officer leaves the department, Councilwoman Wells takes it upon herself to blame them leaving on Chief Clark.

72.     Councilwoman Wells is constantly asking for data regarding the police department in an attempt to find something to attack or look for ways to blame Chief Clark.

73.     By way of example, in September 2021, Councilwoman Wells wanted Cooper to reopen an investigation that had concluded nearly a year ago during which a member of the police department had made claims against Chief Clark, which were investigated, and found to be unfounded.

74.     Additionally, Chief Clark is now required to send Cooper reports every morning detailing data on the police department, upon information and belief, something no other department head is required to do.

75.     Moreover, Councilwoman Wells wanted to see a copy of every exit interview and every grievance filed against Chief Clark in an attempt to demean Chief Clark and punish him for participating in the sexual harassment investigation into Chief Horton.

76.     On or about September 12, 2021, Cooper received an email from an anonymous individual(s), specifically "Concerned Citizens of Forest Park," that stated that Councilwoman Wells and her husband had physically assaulted a citizen.  A criminal investigation was opened.

77.     Soon thereafter, Chief Clark received information that the investigation appeared to have been compromised as Councilwoman Wells had received confidential information from someone at the police department regarding details of the investigation.

78.     In fact, on September 22, 2021, Councilwoman Wells posted a lengthy video (14.5 minutes) to Facebook in which she appears to reference paperwork she was receiving from a member of the police department regarding the investigation.  Councilwoman Wells compromised the integrity of the police department which is a violation of her duties as a City Council member.

79.     In that same Facebook video, which to date has received 49 comments and 364 views, Councilwoman Wells made several false statements about Chief Clark with the specific intent to do harm.

80.     Specifically, among other things, Councilwoman Wells accused Chief Clark of conducting an "illegal" investigation against her, one that was "not investigatable."

81.     Additionally, the Facebook video said of Chief Clark, "There's political activists, but you ain't got time to come to the meeting and address the people concerned or you don't have time to explain to us why all of these officers are leaving under your leadership.  But you got time to appoint someone to investigate me.  That's a problem."

82.     Moreover, the Facebook video said, "So Chief Clark….go back to Arkansas because we don't need these issues as far as well, we got rid of it.  You know we got rid of it.  Now you want to try and sue the City because you're afraid of your job.  Well if you did your job, you wouldn't have to worry about it…"

83.     In other words, Councilwoman Wells was compromising the integrity and credibility of the police department, and more specifically, Chief Clark.

84.     This video caused considerable disruption to the order and morale of the police department and caused several subordinates to question Chief Clark's leadership.

85.     The video also harmed Chief Clark's reputation both internally and externally with the general public.

86.     The video was so controversial that on January 4, 2022 another Councilwoman, Kimberly James, filed an ethics complaint against Councilwoman Wells alleging, among other things that the Facebook video was "false, misleading, unethical, without merit, humiliating and

13

defaming the character of staff and elected officials."  The ethics complaint further stated, "[t]he information caused the public, which includes staff in every department including police, as well as residents, non-residents, business owners and potential business owners to question the integrity of everyone personally named in the outrageous video."  *See **Exhibit G,** Ethics Board Complaint Form* which includes a transcript of the Facebook posting.

87.     A hearing was held on Councilwoman James' ethics complaint on February 3, 2022 during which Councilwoman James, Councilwoman Wells and various other individuals testified under oath.  The hearing officer Gregory D. Jay, Esq. also attended the hearing.

88.     On February 15, 2022, Mr. Jay issued a written "Hearing Officer Report and Recommendation."  In that written report, Mr. Jay wrote that although the Facebook account was private, Councilwoman Wells was "commenting on matters directly related to Forest Park and its governance including employees and fellow elected officials."  He further stated that, "Taken in its totality, the scope and remarks of the Facebook tirade seem to run afoul of the dictates of the *Code of Ethics* and the *Ethics Ordinance*. . . Derogatory remarks and accusations leveled at staff such as ordering an investigation of an elected official severely undermine staff's authority and hinders the day-to-day operations of the City.  These remarks also fuel inuendo amongst other employees and the community at-large.  Moreover, these types of accusations when made to the public only work to harm the City's reputation and ability to attract quality personnel. . . Elected officials may zealously advocate for their position, however such advocacy should not be personal in nature and should be civil and grounded in fact."  The report recommended that the City Council issue a censure or reprimand.

14

89.     On or about March 7, 2022, Councilwoman Wells  was "formally censured for her unacceptable and inexcusable behavior" and was "called upon to cease the afore-mentioned behavior and to conduct herself in a manner fitting the office of City Council Member."

90.     Although it appeared that at least one high-ranking City official was aware that Councilwoman Wells had received details regarding the confidential investigation improperly, and had known for some time, no action was taken to investigate.

91.     On October 7, 2021, Chief Clark sent Cooper an email requesting an external investigation (to avoid the appearance of impropriety) as it had appeared that someone at the police department has been leaking information to Councilwoman Wells while there was an open investigation pending.

92.     Upon information and belief, no action has been taken to investigate Chief Clark's concerns.

93.     Chief Clark has repeatedly complained to his City Managers, members of the Governing Body, the City's in-house attorney and the City's outside attorney regarding the retaliation he is experiencing.

94.     Several City officials, including Cooper, have admitted and acknowledged the retaliation Chief Clark is experiencing but have done nothing to stop it.

95.     Chief Clark was told by a City official that the City is attempting to dissolve the position of Public Safety Director, decrease his salary, and eventually terminate his employment based on his involvement in the sexual harassment investigation of Chief Horton.

**COUNT I**
**RETALIATION UNDER THE**
**GEORGIA WHISTLEBLOWER PROTECTION ACT, O.C.G.A. § 45-1-4** *et seq.*
**(DEFENDANT CITY OF FOREST PARK, GA)**

96.     Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

97.     At all times relevant to this action, Chief Clark was a "public employee" for purposes of the Georgia Whistleblower Protection Act, O.C.G.A. § 45-1-4.

98.     Defendant City of Forest Park, GA is a "public employer" as defined in O.C.G.A. § 45-1-4.

99.     Pursuant to O.C.G.A. § 45-1-4, it is unlawful for a public employer to retaliate against a public employee "in the terms or conditions of employment for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency."

100.     On November 4, 2020, Chief Clark demoted from his position of Deputy City Manager.  Specifically, Chief Clark's contract was amended so that he would only serve as Public Safety Director and Chief of Police.  Chief Clark was only to serve as Deputy City Manager in the absence of a City Manager.

101.     However, even these duties have been stripped as Chief Clark does not serve as Deputy City Manager in the City Manager's absence.

102.     Chief Clark was demoted due to his uncovering of unlawful and fraudulent activity, specifically including his uncovering of financial discrepancies, pay disparities, systemic racism, illegal quotas, and other unlawful and fraudulent activity.

103.     Chief Clark also experienced a hostile work environment in retaliation for his uncovering of these unlawful and fraudulent activities.  Specifically, Chief Clark was asked to do

16

things that other department heads were not required to do and his work continues to be scrutinized and nitpicked.

104.    These adverse employment actions were in retaliation for Chief Clark's disclosing violations or noncompliance with laws, rules or regulations in violation of the Georgia Whistleblower Protection Act, O.C.G.A. § 45-1-4 *et seq.*

105.    These adverse employment actions have caused Chief Clark to suffer damages in the form of loss of future earning capacity in that his credentials as Police Chief, Public Safety Director and Deputy City Manager and reputation have been besmirched.  Additionally, Chief Clark has suffered lost benefits of employment, emotional distress, mental anguish, humiliation, and pain and suffering.

### COUNT II
### RETALIATION UNDER TITLE VII OF THE
### CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*
### (DEFENDANT CITY OF FOREST PARK, GA)

106.    Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

107.    At all relevant times, Plaintiff was an "employee" of the City as that term is defined by Title VII.

108.    At all relevant times, the City was an "employer" as that term is defined by Title VII.

109.    In June/July 2019, Chief Clark uncovered and reported illegal practices within the police department including an illegal quota system for citations and systemic race and religious discrimination practices including recruitment disparities and "Give a Christian a Ticket Sunday" which was a practice whereby police officers would target Black and Hispanic Churches and give citations to members of those communities.

110.    Despite Chief Clark's uncovering of the illegal quota system for citations, some members of the Governing Body wanted the police department to continue issuing citations for profit.  Chief Clark made it clear to the Governing Body that citations would be issued for the protection of society and not to generate revenue.

111.    On November 4, 2020, Chief Clark demoted from his position of Deputy City Manager.  Specifically, Chief Clark's contract was amended so that he would only serve as Public Safety Director and Chief of Police.  Chief Clark was only to serve as Deputy City Manager in the absence of a City Manager.

112.    However, even these duties have been stripped as Chief Clark does not serve as Deputy City Manager in the City Manager's absence.

113.    In March 2021, Chief Clark engaged in further protected activity.  Specifically, as part of his responsibilities as Public Safety Director, he participated in an internal investigation of sexual harassment allegations against Fire Chief Don Horton.

114.    Since March 2021, Chief Clark has been stripped of additional job responsibilities including his responsibilities as Public Safety Director as the Fire Chief no longer reports to him but instead reports to the City Manager.  Chief Clark's authority at the fire department is now limited to approving bills.

115.    Moreover, Chief Clark has experienced a hostile work environment in retaliation for his involvement in the investigation into Brown's sexual harassment allegations against Chief Horton.

116.    The City engaged in retaliatory practices intentionally and/or with malice and/or reckless indifference to Plaintiff's rights.

117.    These adverse employment actions have caused Chief Clark to suffer damages in the form of loss of future earning capacity in that his credentials as Police Chief, Public Safety Director and Deputy City Manager and reputation have been besmirched.  Additionally, Chief Clark has suffered lost benefits of employment, emotional distress, mental anguish, humiliation, and pain and suffering.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## UNDER THE COMMON LAW OF GEORGIA
## (DEFENDANT WELLS)

118.    Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

119.    As a direct and proximate cause of Councilwoman Wells' actions, Chief Clark has suffered damages in an amount to be proven at trial.

120.    Councilwoman Wells' actions demonstrate willful misconduct, malice, wantonness, oppression and want of caring raising the presumption of conscious indifference to the consequences of her actions, entitling Plaintiff to punitive damages under O.C.G.A. § 51-12-5.1.

121.    Chief Clark has suffered extreme emotional distress as a result of the actions of Councilwoman Wells as his reputation—something a Police Chief relies heavily on and cannot function without—has been tarnished in the police department, the City, and the community.

## COUNT IV
## SLANDER PER SE PURSUANT TO O.C.G.A. § 51-5-4
## (DEFENDANT WELLS)

122.    Plaintiff incorporates by reference all preceding paragraphs of the Complaint.

123.    Councilwoman Wells' Facebook post on September 22, 2021 contained numerous false and defamatory remarks regarding Chief Clark and imputed to him a crime punishable by

law—specifically an alleged illegal investigation into Councilwoman Wells—and made charges against Chief Clark in reference to his trade, office, or profession calculated to injure him in violation of O.C.G.A. §§ 51-5-4(a)(1) and (3).

124.    In this video, Councilwoman Wells compromised the integrity and credibility of the police department, and more specifically, Chief Clark.

125.    This video caused considerable disruption to the order and morale of the police department and caused several subordinates to question Chief Clark's leadership.

126.    These statements have negatively impacted Chief Clark's reputation both internally in the City and police department and externally in the community in which he works.

127.    Councilwoman Wells made these statements maliciously and with the specific intent to do harm to Chief Clark and to punish him for exposing a hostile work environment and for questionable and illegal acts.

128.    Councilwoman Wells' actions demonstrate willful misconduct, malice, wantonness, oppression and want of caring raising the presumption of conscious indifference to the consequences of her actions, entitling Plaintiff to punitive damages under O.C.G.A. § 51-12-5.1.

**WHEREFORE,** the Plaintiff demands that a trial by jury be had on all Counts of his Complaint and that the following such judgment be entered on his behalf against Defendants granting the following relief:

(a) that Defendants be Ordered to make Plaintiff whole by providing for his out-of-pocket losses including any back pay in an amount equal to the sum of any wages, salary, employment benefits or other compensation denied or lost as a result of Defendants'

unlawful and discriminatory acts, together with interest thereon, all in amounts to be determined at the trial;

(b) that front pay be awarded as the employment relationship has been so severely damaged that the relationship is unsalvageable;

(c) that compensatory damages be awarded against each Defendant individually to compensate Plaintiff for his mental and emotional distress, anxiety, humiliation, outrage, and loss of professional and personal reputation as a consequence of Defendants' actions in an amount to be determined at the trial;

(d) that punitive damages be awarded against Defendants in an amount to be determined at trial to deter Defendants and others from similar misconduct in the future;

(e) that Plaintiff be granted attorney's fees and expenses of litigation pursuant to O.C.G.A. §§ 45-1-4(f) and 13-6-11;

(f) appropriate declaratory and injunctive relief;

(g) that pre-judgment and post-judgment interest be awarded; and

(h) that Plaintiff be granted such other and further additional relief as the jury deems equitable and just.

Respectfully submitted, this 15th day of June, 2022.

s/ Jackie Lee
Jackie Lee
Georgia Bar No. 419196
jackie@leelawga.com
LEE LAW FIRM, LLC
1100 Peachtree Street NE, Suite 250
Atlanta, Georgia 30309
Telephone: (404) 301-8973

**COUNSEL FOR PLAINTIFF**

EFILED
CLAYTON COUNTY, GA
6/15/2022 3:57 PM
Jacquline D. Wills
CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| NATHANIEL CLARK, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF FOREST PARK, GA; | ) | Civil Action No.: 2021CV03928-14 |
| LATRESA AKINS-WELLS, in her | ) | |
| individual capacity | ) | |
| | ) | |
| DEFENDANTS. | ) | |

### CERTIFICATE OF SERVICE

I certify that on June 15, 2022 I electronically filed the foregoing **Plaintiff's Second Amended Complaint** with the Clerk of Court which will automatically send notification of such filing to all counsel of record and by e-mail to the following counsel of record:

Michael M. Hill
Shaheem M. Williams
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339
mhill@ fmglaw.com
shaheem.williams@fmglaw.com

Karen Woodward
Cruser, Mitchell, Novitz, Gaston & Zimet, LLP
Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, GA 30092
kwoodward@cmlawfirm.com

_s/ Jackie Lee_
Jackie Lee
Georgia Bar No. 419196

# Exhibit A

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 24, 2022

Mr. Nathaniel Clark
c/o Jackie Lee, Esquire
Lee Law Firm
1100 Peachtree St., NE
Suite 250
Atlanta, GA  30309

Re:  EEOC Charge Against City of Forest Park
    No. 410202103955

Dear Mr. Clark:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Atlanta District Office, Atlanta, GA.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                    Sincerely,

                    Kristen Clarke
               Assistant Attorney General
                 Civil Rights Division

        by      /s/ Karen L. Ferguson
                 Karen L. Ferguson
           Supervisory Civil Rights Analyst
           Employment Litigation Section

cc: Atlanta District Office, EEOC
  City of Forest Park

# Exhibit B



**Albert Barker Jr.**
City Manager

745 Forest Parkway
Forest Park, GA 30297
Phone: (404) 366-4720
abarker@forestparkga.org

CITY OF
FOREST PARK

Date: June 19, 2020

RE: Employment Offer

Mr. Nathaniel Clark,

Pursuant to our conversation, the City of Forest Park would like to offer you the position of **Public Safety Director/Deputy City Manager**. A copy of the job description is attached. Your salary will be discussed at a later date.

Please formally confirm your acceptance of this job offer and starting date of July 1, 2020 by signing the appropriate section below and return it to me at your earliest convenience.

Sincerely,

Albert Barker,
City Manager

**Accept Job Offer**
**I accept this job offer:**
Signature: _____    Date: 6/19/20

**Decline Job Offer**
**I decline this job offer:**
Signature: _____    Date: _____

CITY HALL • 745 FOREST PARKWAY, FOREST PARK, GA 30297
WWW.FORESTPARKGA.ORG

Scanned with CamScanner



**CITY OF**
# FOREST PARK

**Albert Barker Jr.**
City Manager

745 Forest Parkway
Forest Park, GA 30297
Phone: (404) 366-4720
abarker@forestparkga.org

August 10, 2020

To: Nathaniel Clark, Public Safety Director/Deputy City Manager

From: Albert Barker, City Manager

RE: Public Safety Director/Deputy City Manager

This letter comes as congratulations referencing your acceptance of the position of Public Safety Director/Deputy City Manager, effective July 01, 2020. As stated in your acceptance letter, you shall be afforded all benefits and education incentives granted to a department head, specifically Police Chief and Fire Chief. Also, pursuant to the Council Meeting on July 20, 2020 and pursuant to a unanimous vote by the governing body, your initial contract is hereby amended to reflect the new position of Public Safety Director//Deputy City Manager, education incentives and salary.

Albert Barker

City Manager

City of Forest Park

CITY HALL • 745 FOREST PARKWAY, FOREST PARK, GA 30297
WWW.FORESTPARKGA.ORG

Scanned with CamScanner

# Exhibit C

# THE CITY OF FOREST PARK

SUMMARY DESCRIPTION - Public Safety Director/Deputy City Manager

The Public Safety Director/Deputy City Manager reports to the City Manager and his/her primary role is to assist in the planning, directing, management and review of the activities and operations of the city relating to Police Department * Fire Service * 911 * Animal Control * Public Information Officer. However, the Deputy City Manager has supervisory responsibility over all departments in coordination with and subject to the direction of the City Manager.

JOB FUNCTIONS The following duties are normal for this position. They are not to be construed as exclusive or all inclusive. Other duties may be required and assigned.

- Assumes full management responsibility for public safety services and activities; manages the development and implementation of departmental goals, objectives, and priorities for each assigned service area; recommends and administers policies and procedures.
- Plans, organizes and directs the activities of all departments pertaining to public safety, including the Police Department and Fire Department, providing general law enforcement, criminal investigation, fire suppression and prevention, rescue services and emergency medical services and disaster responses. Oversees the hiring, supervision, training, evaluation and discipline of department employees.
- Develops long term plans to improve departmental operations.
- Develops annual department budgets for operations and equipment. Also assists in developing long-range capital budgets for various public safety programs. Monitors the departmental budgets throughout the fiscal year and oversees the purchase and maintenance of equipment, vehicles, and supplies.
- Establishes, within City policy, appropriate service and staffing levels; monitors and evaluates the efficiency and effectiveness of service delivery methods and procedures; allocates resources accordingly.
- Plans, directs, and coordinates, through subordinate level staff, the work plans for the Police Department and Fire Department; assigns projects and programmatic areas of responsibility; reviews and evaluates work methods and procedures; meets with key staff to identify and resolve problems.
- Provides staff assistance to the City Manager and City Council; prepares and presents staff reports and other necessary correspondence; attends City Council and other meetings as required.
- Coordinates assigned activities between public safety departments with those of other city departments and outside agencies and organizations.
- Responds to and resolves difficult and sensitive citizen inquiries and complaints; explains, justifies, and defends department programs, policies, and activities.
- Participates on a variety of boards; serves as the city's representative and/or appoints a designee to committees and community organizations concerned with improvements in law enforcement and fire services, public education, and departmental public relations.
- Supervise a group of department heads and/or other staff.
- Direct the activities of assigned departments, review and evaluate work methods and procedures, identify opportunities for improvement and implement changes.

6/19/00

Scanned with CamScanner

# Exhibit D

| From: | Nathaniel Clark/fppolice |
|---|---|
| To: | Albert Barker/CoFP@CoFP |
| Cc: | Nathaniel Clark/fppolice@fppolice, Gretta Harris/CoFP@CoFP |
| Bcc: | nclark71603@yahoo.com |

| Date: | Friday, September 04, 2020 12:23PM |
|---|---|
| Subject: | Finance Department - External Audit Recommended |

Mr. Barker,

Recently Finance Director Ken Thompson brought to our attention that in past years SPLOST expenditures were charged to account(s) that doesn't exist. Based on the financial inconsistencies recently brought to our attention, I am recommending that an external audit be conducted immediately regarding any and all finances.

Thanks in advance.

Chief Nathaniel Clark
Deputy City Manager/Public Safety Director
City of Forest Park
745 Forest Parkway
Forest Park, Georgia 30297
(w) 404-366-4720

'Serving with Pride, Honor and Professionalism'

# Exhibit E

**From:** Nathaniel Clark
**Sent:** Friday, August 27, 2021 7:17 AM
**To:** Darquita Williams <DWilliams@forestparkga.gov>
**Cc:** Nathaniel Clark <nclark@forestparkga.gov>
**Subject:** Federal Asset Audit (status)
**Importance:** High

Good Morning Deputy Finance Director Williams,

Pursuant to the conversation with the city manager on 8/19/21 whereas you were authorized to have an audit conducted on the federal asset accounts(s), I am respectfully requesting the status regarding said and to be kept abreast.

Thanks in advance.

# Exhibit F

**From:** Nathaniel Clark
**Sent:** Wednesday, October 28, 2020 8:11 AM
**To:** Albert Barker <abarker@forestparkga.gov>
**Cc:** Nathaniel Clark <nclark@forestparkga.gov>
**Subject:** Funding Concerns
**Importance:** High

'Follow-up'

Good Morning Sir,

Pursuant to discussions, during the past few months assessments of various city departments have been conducted and several discrepancies were identified in the area of finance, please note the following area of concerns:

SPLOST Funds
E-911 Funds
FBI Reimbursement (*task force*)
Federal Asset Forfeiture/Equitable Sharing
Documentary and Procedural Issues with these and other funding issues

I have spoken with Finance Director Ken Thompson regarding these issues and the following were stated/identified in part:

* Current SPLOST Funds (*per Director Thompson's admission to you and me – funds were charged in the past to accounts that doesn't exist*)
* E-911 Funds (*possibly co-mingled with the city's general funds*)
* Bank Reconciliations/Discrepancy (*per Lori Muise, Finance Dept. approximately $200,000+*)
* FBI Reimbursement - Task Force (*per Wanda Dutton, there appear to be funding discrepancies*)
* GEMA – Emergency Management Performance Grant (*per Elaine Comer, Fire Department*) there appear to be funding discrepancies)
* Federal Asset Forfeiture/Equitable Sharing (*procedural concerns i.e. bank books, employee names on accounts*)

As you are aware, in the past two companies conducted audits of the police department where issues were found and corrected (*see audits by Ken Bell and Associates and Lawrence Johnson*)

On or about October 23, 2020 I contacted Brian Boykin, Equitable Sharing Program Manager - U.S. Department of Justice; pursuant to the conversation and updating you, I am recommending an immediate audit referencing procedural concerns, expenditures and balance to ensure transparency and compliance review.

1

Exhibit G



### CITY OF FOREST PARK
### ETHICS BOARD COMPLAINT FORM
c/o City Clerk
745 Forest Parkway
Forest Park, GA 30336
404-366-1555



For Internal Use:
Date Stamp: JAN 0 4 2022
By
Complaint #:
EC-2022.01

**CITY OF FOREST PARK**

ALLEGING A VIOLATION OF THE FOREST PARK ETHICS POLICY

**I. FORM FOR WRITTEN COMPLAINT:** Each complaint filed with the Board shall be in writing and notarized by the party filing the complaint. Each complaint shall state with specificity the following:

 ♦ The name and address of the person filing the complaint
 ♦ The name and address of the party against whom the complaint is filed
 ♦ A clear and concise statement of facts upon which the complaint is based
 ♦ A reference to the applicable code sections of the City Ethics Policy deemed to be violated
 ♦ Any other information to support the allegations, including documents, names, dates, times, places, actions, and any other information or persons showing or having knowledge of the facts to support the allegations.
 ♦ All exhibits must be clearly labeled and legible
 ♦ All exhibits must be referenced in the complaint
 ♦ The complaint number will be issued by the clerk, use this number for future references

**II. PERSON BRINGING COMPLAINT:**

Name: Kimberly James

**III. PARTY AGAINST WHOM COMPLAINT IS BROUGHT:**

Name: Latresa Akins-Wells

Title of office held or sought. (If applicable) City Council Member Ward 4

**IV. STATEMENT OF FACTS:**

State in your own words the detailed facts and the actions of the party named in Paragraph III upon which the complaint is based. Please identify the facts of the allegations that constitute one or more violations of the Ethics Policy of the City of Forest Park. The brief space provided below is not intended to limit your statement of facts. (Use additional sheets if necessary)

1

On 9/22/21- Latresa Akins-Wells as a member of the governing body published a live Facebook video post with information that was false, misleading, unethical, without merit, humiliating and defaming the character of staff and elected officials. The information caused the public, which includes staff in every department including police, as well as residents, non-residents, business owners and potential business owners to question the integrity of everyone personally named in the outrageous video. There was no truth to the statement being made. On 11/15/21 & on 12/6/21 Latresa Akins-Wells did not show up for 4 regularly scheduled meetings( 2 Work Sessions and 2 Council meetings). She did not provide any "just cause" prior to the meetings nor after the meetings. No one was notified of any emergency or provided with any notice of justification. She just did not show up and purposely failed to communicate. I prepared to communicate to Akins-Wells and the governing body that I wanted the video taken down and provided council with a prepared transcript of the video for discussion. Since Akins-Wells was absent, I asked the City Attorney, Mike Williams to communicate my desire prior to filing this complaint. Akins-Wells has used public forums such as the dais, social media, and city sponsored events to humiliate elected officials, city staff and city contractors of whom she may have an opposing point of view. She shows no signs of retracting falsehoods and displaying high ethical standards as an elected official.

See attached transcript and video post Facebook.

_V._ Identify and List the Section(s) of the Ethics Policy allegedly violated:

**Section 2-1-33b** - Absence not justified and reasonable.   **Section 2-6-1(c) 2&3** -Impeding government efficiency & affecting adversely the confidence of the public in the Integrity of the government.
**Section 2-6-5a, d, l, m, w** - securing confidential information & special privileges , agreeing to receive value information, humiliate city workforce, use of official information for private interest, violate charter or ordinance. Also, I am not alleging **O.C.G.A 16-10-24a** but depending on the testimony during any subsequent hearing, I would like to reserve the right to allege such violation.

## VERIFICATION BY OATH OR AFFIRMATION

STATE OF GEORGIA
COUNTY OF CLAYTON

PERSONALLY, APPEARED before the undersigned officer, duly authorized to administer oaths, came the undersigned complainant,_____Kimberly James_____, who after having been duly sworn, states under oath that: 1) the undersigned complainant is a resident of the City of Forest Park and 2) that the statements in the foregoing complaint are true and correct to the best of his/her knowledge. The undersigned complainant further acknowledges that false statements made in this complaint may result in criminal and/or civil liability, including in a prosecution against them for false swearing, a felony under Georgia law. See O.C.G.A 16-10-71.

_Kimberly James_
Signature of Complainant

_1/4/22_
Date

Sworn to and subscribed before me on the ____4th____ day of ___JANuary___, 20_22_

_She barbara D White_
Signature of Notary Public

My Commission expires____6/24_____

(Notary seal: SHE... BARBARA D WHITE, MY COMMISSION EXPIRES JUNE 24, 2023, NOTARY PUBLIC, FULTON COUNTY, GEORGIA)

2

up.

Transcript of Facebook posting

Good morning. So look, this is something that I don't normally do. I don't do the talking to the phone stuff. The video stuff I don't do. None of it. But it's 9:00 o'clock in the morning. And I'm on my way.

To meet with somebody to give me evidence that Forest Park Police Department is investigating me again. Again I got a call the other day and they just called me. The first call I got they said, please help us.

It's from my Police Department. Please help us. And I'm like, you know, just everything is gonna get better. Just give us time. You know I'm sorry y'all having to go through these. This is me. I get these calls constantly constantly right, so nobody knows what I had to deal with as a Council person and how it affects me. I mean how it bothers me just trying to fight and do the. The right thing for my community. And the one that's doing the most get. The most heat. You know, if I wasn't doing nothing, they wouldn't bother me so I could take that. I can accept that, but when other people hurt, it hurt, and it it bothers me. Because we made changes before. At first it was white administration investigating me. Now it's black administration investigating me. Our new city manager who has been there less than a year. Mr. Cooper. Our new police chief who's been there almost three years, if not three years already. Nathaniel Clark. Angelyne Butler, who is the current mayor? Uhm, Kimberly James. So it's not a black and white thing. It's not a black and white thing. Race has absolutely nothing to do with it, I guess now. Since they're investigating me, they say I got into a fight at a club and me and my husband sell drugs and we get money from the. People in the club I don't even go to the club. Yeah, go to JB's. That's the only place in the city for adults to go and enjoy an adult night. So I go when I get ready. I'm I'm human. I can do that. It's not unethical. It's not illegal. But when people? Write a letter to the city manager who works for us, the mayor and council. We're his bosses, so you order. The police chief, Nathaniel Clark, to investigate your boss illegally because nobody filed any complaints with the Police Department. There's no victim. There's no nothing, and I got into a fight. Who I get into a fight with? Who filed the complaint? Because the letter is not a formal complaint. Cooper, doctor Cooper So while you, Angelyne Butler, Allen Mears and y'all, you know. Kimberly James, y'all doing everything y'all can to get rid of council woman Wells. What have y'all done in this community? Angeline Butler, what have you done in this community? I'm sick of it. See they want me to be quiet and that's what they get angry about. That's why they frustrated with me because I I'm outspoken and

that's what the people elected me to do. So I'm gonna speak up. I'm gonna speak up. They tried to pass the ordinance on Monday that restrict the everything 'cause they're trying to get me caught up. They want everything that I do. I open my door and step on my step. They want it to be an ethics violation against me. So they tried to make it happen, but no weapon formed shall prosper and they didn't pass and they were so upset they was all looking crazy and texting. Each other during the meeting because they planning to plot against Councilwoman Wells but God. He's not seeing it. That's why God brought this person to me. And this guy called me and said, I want you to be careful because. They are after you. They are after you. We got 50 investigations on this desk. 50 investigation on this desk, yet they want to waste the tax, the city resources which is your Police Department on investigating something that's not even investigatable. If that's a word. It shouldn't even be investigating. It's nothing criminal you. You're investigating behavior. You can't get mad if I don't like somebody. If I don't speak to somebody, that's me. But to have somebody investigate me for y'all to come over these frivolous complaints is ridiculous. Like we got so much other stuff, we can be focused on, like why the mayor been in office for four years. This fire station supposed been built the sign been sitting out there two years that haven't happened. We got these Fortune 500 companies which she sit on. The board she know about. But you haven't opened those jobs to the citizens of Forest Park. Nobody informed nobody I know got one of those jobs over at Fort. Gillem making 18 $20 an hour. Nobody I know. I don't know if y'all got somebody over there, but that's the type of stuff we need to be focused on. But yet and still they wanna keep focusing on. Me because they love what I do. They just hate the fact that it's me doing it, you know? They just hate the fact that it's me doing it and it's embarrassing. It's so embarrassing 13 people out of the City of Forest Park came out to vote yesterday for the Commissioner of Clayton County and for school board. Yeah, we gotta really y'all gotta know who y'all put in office. Y'all gotta know that these people don't care nothing about y'all Angelyne Butler moved here just to run for mayor. OK, she moved here just to run for mayor because the Last one, the other one needed to go and that was the only person we had to go with. So we messed up. Please don't mess up this time. Kimberly James does absolutely nothing. This Mr. Cooper guy came from Florida to investigate your Council people. People that he worked for. Because I'm not a because I'm not a yo yo and they can't tell me what to do. I don't work for y'all. I work for the people of forest part that's who can call me and tell me whether that's who can call me and, say Councilwoman wells be quiet.

If you live in Ward 4 and you want me to be quiet and you want me to stop doing what you elected me to do, call me. Call me, I will do it, but don't another elected official that's on the same level as me.  Don't control me. And see that's what they want. They want somebody that they can control.  That's why they moved my daughter out of HR. Which was a better a good move 'cause she didn't have to deal with the politics up there? They did all that because of me. Now they now they harassing my husband on his job. They're getting rid of people because they sat on Councilwoman side at the at the Council meeting. Didn't give this man a right to appeal, you know, to voice his ... they just listen well.  His appeal was in writing, So what I heard you know. But this is the type of stuff that they do. This is this type of stuff. They do. This stuff is so middle school and high school to me, but I refuse to be quiet so I'm getting ready to go meet this guy. Get the information. That he has for me to let me know that. They are investigating me again. And talk to my attorney again. This is what I have to deal with. Like don't nobody know When I tell you nobody know how I feel. Coming from a council meeting. Being  voice for the people getting out here trying to do things to bring in my community together, you never  seen there one of them at the event.  That should tell you something.  It's a city sponsored event.  If it's about the people, why aren't they there?  Because it's not about you.  It's about me like they focus they so focused on me and it's heartbreaking.  Like there's no way I should have to wake up to to go meet.  Somebody from my department.  They're scared of losing their job but won't to help me.  I'm tired I'm so tired and see The thing is they want me to step down.  But you don't have no reasons.  I had two ethics violations where two complaints, one person said.  I was stalking.  Her they got time to stalk nobody.  'cause our police chief was meeting had a meeting.  You got time to meet with these people.  There's political activists, but you ain't got time to come to the meeting and address the people concerned or you don't have time to explain us why all of these officers are leaving up under your leadership.  But you got time to appoint somebody to investigate me.  That's a problem.  That's a problem. And stuff bothering me so much and it shouldn't because I've been. In it for 10 years.  But ever since I've been in it, I've been giving my all and getting nothing, so it ain't never about me.  It ain't about no money 'cause I don't get paid enough to deal with what I have to deal with, you know?  The same community I'm fighting for fighting against me. Now I had to go through this lawsuit, stuff, nobody know what I had to deal with with that It still it affects me. It ain't never about no money, never about no money it's about this community man. I do all

this for my community then you got people that ain't even from the community that don't even know the community coming in here trying to attack me. And I'm tired of it like I was just telling my son Quez I was so frustrated yesterday. I was so frustrated because I had just got the call. He wouldn't come in and joke with me and stuff and I'm just trying to smile, but deep down inside I'm hurting 'cause this junk is so frustrating. Like why y'all keep coming for me. Why y'all keep coming for me? Because I'm fighting for my community. You don't like it 'cause you don't do nothing. But I'm not gonna be quiet, so find out at this complaints you wanna you know I got into it with with a landlord they wanna fire at this complaint I love it is political. They doing everything in their power to try to get rid of me. They didn't put me in office. The people did. So if y'all want me gone, I will go. I would go, but I don't deserve to keep going through this stuff because somebody taking something personal that's on you. But I ain't never had a passion for fighting for people like I do now because I feel like I make a difference. I know I make a difference and they know I make a difference and that's why they hate me. But I didn't know people can be that low down and dirty to the point where you would just make up all types of things come and ask me the one person that's going hard and fighting so hard for the community come and ask me to step down because you feel 'cause you got issues with yourself. You know, like you wanna be in power I don't care about the power nobody got to call me Councilwoman. Though I am Shantae OK. I'm shante, I'm gonna always be shante a title don't make me. And if I step down today, I'm still be out in my community and still doing what I need to do. That's what make y'all mad y'all. But y'all. Hung up on. Titles I don't care about that, so chief clark. Go back to Arkansas because we don't need these issues as far as well, we got rid of it. You know we got rid of that. Now you want to try to sue the city because you're afraid of your job. Well if you did your job, you wouldn't have to worry about it, Butler if you did your job, you wouldn't have to worry about it. You know, like it's ridiculous like these people ganging up on me little Shantae I got that much power. Put that energy into something else. Put that energy into our community. I promise you it needed. We need grocery stores. We need restaurants. We need boutiques. We need the Main Street to look like a Main St. We need something our kids to do. We need jobs for our people. We need better homes, you know. It focuses on that. Why y'all so? Hung up on me. I don't get it. I don't get it. But I'm tired of it like I'm so tired of it, so I'm going to meet with my attorney. And I gotta sue the city that I love in the city that I grew up in again, because they want to keep illegally investigating me. Ain't told my Mama ain't told my brothers ain't

told nobody. Nobody 'cause I've been trying to deal with it by myself, but this junk is so overwhelming and so frustrating. I'm tired of it. I'm so tired of it. I am tired of it Dr. Lawanda Falami stood up in the Council meeting and threaten me. Oh I'm from the street so I know how I'm I'm. I'm I'm what she say I'm stalking her. 'cause somebody sent me a picture of her meeting with our police chief, a car, her car and another person car. So the other lady said that I'm stalking them and filed an ethics complaint  well, baby, I didn't even take.  The picture, so now what? They got the officers doing is focusing on who sent me that picture instead of focusing on her threatening me. In the council meeting, you from the street, what that mean. Now I'm fearing for my life. 'cause I don't know what she what that meant you from the street? you know how to deal with it? But I ain't doing nothing about that, but they investigating me. But, I'm gonna go get my evidence. And I'm gonna meet with my attorney. And I'm gonna handle it the right way. You know so y'all just pray for me. 'cause I'm tired like this junk is impacting my life. I'm out here fighting for the people and then and and trying to make everybody else happy and put smiles on everybody else face. And then I'm going to bed at night crying because what's going on with me? What people trying to do to me? You know, I got a. Family I I care for. But I focus so much on this city and the people in this city. And then these people don't need focus on on the things that need to be focused on. Like you have a Councilwoman that care that has your best interests at heart. But you got these people that move here because they want power. And we give it to him. And then they turn around and do stuff like this so. If you support me, the only thing I ask you to do is please go November the 2nd to parks and rec and cast your vote and get Kimberly James out of office. Get angelyne Butler out of office. And Mears is coming up when I come up in 2023. There has got to be a change like we done came too far. We still got a long way to go, but they're trying to set us ten years back. And they hate. The fact that I ain't with them. They hate the fact that I ain't with them, but I love y'all. Pray for me. It is what it is. I guess the fight is on once again.



